1
2
3
4
5                    IN THE UNITED STATES DISTRICT COURT
6                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
7

8    MIAYA DENEEN WHITEHEAD,              Case No.  22-cv-04049-CRB

9                   Plaintiff,

10          v.                             **ORDER GRANTING DEFENDANTS'
                                          REQUEST FOR JUDICIAL NOTICE
11   NETFLIX, INC., et al.,                AND INCORPORATION BY
                                          REFERENCE AND MOTION TO
12                  Defendants.            DISMISS WITHOUT LEAVE TO
                                          AMEND**

13          <u>Pro se</u> Plaintiff Miaya Deneen Whitehead ("Whitehead") brings this action against

14   Netflix, Inc., Margaret C. DeLoatch, Mega-Diva, Inc., John E. Rigney Robert West, Scott

15   Hartle, Netflix Streaming Services, and DOES 1–99 (collectively, "Defendants") alleging

16   copyright infringement under 17 U.S.C. §§ 101, <u>et seq</u>.  Compl. (dkt. 1).  Whitehead

17   claims that Defendants' Netflix series, <u>Family Reunion</u>, is unlawfully derivative of her

18   original self-published novel, <u>No Fairy Tales</u>.  Id. ¶ 2.

19          Defendants move to dismiss Whitehead's Complaint for failure to state a claim

20   under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Mot. (dkt. 20).  In addition,

21   Defendants request judicial notice or incorporation by reference of several items.  RJN

22   (dkt. 19).  Finding this case suitable for resolution without oral argument under Civil Local

23   Rule 7-1(b), the Court VACATES the hearing currently set for December 2, 2022, and

24   GRANTS Defendants' Request for Judicial Notice and Incorporation by Reference, and

25   the Motion to Dismiss.

26   I.     **BACKGROUND**

27          A.     **The Complaint**

28          In March 2015, Whitehead authored the novel, <u>No Fairy Tales</u>, and published it

*United States District Court*
*Northern District of California*

using Amazon's online self-publishing services.  Compl. ¶¶ 1, 3.  <u>No Fairy Tales</u> has been available to "millions of Amazon Kindle subscribers, Amazon Prime subscribers, and direct purchasers" for a fee since this time.  <u>Id.</u> ¶ 3.  Whitehead registered her novel with the U.S. Copyright Office on October 26, 2021.[1]  <u>Id.</u> ¶ 1.  Defendants are the creators and distributors of <u>Family Reunion</u>, a television series first released on July 10, 2019, on the Netflix streaming service.[2]  <u>Id.</u> ¶ 2; Mot. at 6.

Whitehead alleges that Defendants individually and collectively infringed on her copyrighted novel, <u>No Fairy Tales</u>, by (1) copying her work in creating <u>Family Reunion</u> and (2) releasing <u>Family Reunion</u> on Netflix for "millions" of paying subscribers to watch. Compl. ¶¶ 2, 5–6.  Specifically, Whitehead claims that <u>Family Reunion</u> is a derivative work of <u>No Fairy Tales</u> because they share "substantial similarities . . . such as but not limited to the main character of the show, plots and obstacles that the main character [has] with other characters, and even dialogue."  <u>Id.</u> ¶ 4.  Whitehead further alleges that each episode of Defendants' show is unlawfully derivative of her protected work because "the main character in <u>Family Reunion</u> cannot be separated from the main character in [<u>No Fairy Tales</u>]."  <u>Id.</u> ¶ 8.  According to Whitehead, she discovered these similarities late at night while recuperating from a medical procedure, and she felt so "violated" that she "repetitively scream[ed] at the TV . . . and sobb[ed]."  <u>Id.</u> ¶ 4.  Whitehead also claims that Defendants continue to profit off of <u>No Fairy Tales</u> because <u>Family Reunion</u> is still streaming on Netflix.  <u>Id.</u> ¶¶ 6, 8.  However, she neither describes the contents of the works in any detail nor attaches them to her Complaint.  <u>See</u> Compl.

Based on these allegations, Whitehead asserts a copyright infringement claim against Defendants, seeking an injunction and a significant sum in damages, penalties, and attorneys' fees and costs.  <u>Id.</u> ¶¶ 2, 5–6, 8–9.

---

[1] <u>No Fairy Tales</u>' copyright registration number is TX9-035-659.  Compl. at 1.

[2] In their Motion to Dismiss, Defendants argue that several of the parties listed in Whitehead's Complaint (John E. Rigney, Robert West, and Scott Hartle) had no role in the creation or distribution of <u>Family Reunion</u>.  Mot. at 6.  However, because Defendants have not moved to dismiss any party, this order refers to all parties listed as defendants in the Complaint when using the term "Defendants."  <u>See</u> <u>id.</u>

United States District Court
Northern District of California

**B.      Procedural History**

Whitehead filed her Complaint on July 11, 2022.  Compl.  On September 28, 2022, Defendants moved to dismiss the Complaint.  Mot.  Defendants concurrently submitted a request for judicial notice and consideration for incorporation by reference of (1) Whitehead's novel, No Fairy Tales, Ex. 1 to Clark Decl. ("RJN Ex. 1") (dkt. 19-2); (2) Defendants' Netflix show, Family Reunion, Ex. 2 to Clark Decl. ("RJN Ex. 2") (dkt. 19-3); and (3) Whitehead's online State Bar of Arizona membership page, Ex. 3 to Clark Decl. ("RJN Ex. 3") (dkt. 19-4).  Request for Judicial Notice ("RJN") (dkt. 19).  Whitehead opposed Defendants' motion to dismiss on November 4, 2022, and objected to Defendants' request for judicial notice of the works at issue.  Opp'n (dkt. 25).  Defendants replied on November 18, 2022.  Reply (dkt. 26).

**C.      The Works at Issue**

In their papers, the parties frequently refer to the works at issue in this case: (1) Whitehead's novel, No Fairy Tales, RJN Ex. 1, and (2) Defendants' Netflix series, Family Reunion, RJN Ex. 2.  See Compl; Mot.; Opp'n; Reply.  Because they are central to Whitehead's copyright infringement claim, see Compl., the Court next briefly summarizes the portions of No Fairy Tales and Family Reunion most germane to the issues at hand.[3]

**1.      Whitehead's Novel: No Fairy Tales**

Whitehead authored and published her novel, No Fairy Tales, via Amazon's online self-publishing services in March 2015 using the name "Miaya Deneen Bridgett."  Id. ¶¶ 1, 3; RJN Ex. 1.  Whitehead copyrighted No Fairy Tales in October 2021.  Compl. ¶ 1.  The novel is a 264-page work of fiction printed in double-spaced, twelve-point, Calibri-style font.  See generally RJN Ex. 1.  No Fairy Tales is written from the first-person perspective of its main character, Jade Valentine, and features very casual prose.  See generally id.  It is set in the late-1990s and follows the life of Jade Valentine from the time she is a high school senior through adulthood.  See id.  This coming-of-age story features adult-oriented

---

[3]  The Court addresses Defendants' Request for Judicial Notice and Incorporation by Reference of No Fairy Tales and Family Reunion in Part III.A. of this Order.

language, themes, and plotlines, see id., with Whitehead describing No Fairy Tales as "something spicy to read." Id. at 262. The Court outlines the key elements of the novel below.

### a. Jade Valentine: High School Student

For the first 186 pages of the novel, Jade Valentine is a spunky seventeen-year-old high school senior living in Chicago's Westside with her single mother and young siblings. See, e.g., id. at 7, 50–51 ("Although I was only seventeen, I wasn't born yesterday . . . I was a [B]lack girl from Chicago's worst ghetto neighborhood"), 59–60 (describing Christmas with her family). She is Black and has light skin. Id. at 3–4 ("Maybe it was because my African-American heritage made me exotic . . . [but] the only thing [B]lack about me was my hair and ass.").

Jade Valentine's father is largely absent from her life, see id. at 63, 172, and she and her mother often struggle financially. See, e.g., id. at 50 (Jade Valentine worries about affording college applications). Even as a teenager, she is a mature and confident young woman who knows what she wants, see, e.g., id. at 153 ("I told you that when I want something or someone, I go after it or him or her"), but others sometimes limit her, see, e.g., id. at 99 (Jade Valentine's boyfriend breaks up with her because they are "too young for love."). Although she is not particularly passionate about academics, Jade Valentine is a talented violinist and singer hoping to attend college on a violin scholarship. See, e.g., id. at 43 ("I hated math . . . so dropping the class was a win-win for me."), 50 ("[T]he holiday season meant performances and more recognition, and possibly more scholarships to schools I could only dream of attending."), 112 (describing herself as "Jade, the Singing Violinist!").

The early portion of No Fairy Tales primarily follows Jade Valentine's tumultuous and highly sexual relationship with her white seventeen-year-old boyfriend, Tony Georgino ("Tony"). See, e.g., id. at 4 ("He represented white America, and yet, he was three shades darker than me."), 14–21 (describing their first date), 156 ("I was so eager to feel [Tony's] body on mine, but I really wanted him in me.") (emphasis in original). As

4

the novel details, Tony—a "nerdy" but self-assured classmate whom Jade Valentine had previously ignored—unexpectedly sweeps her off of her feet after driving to her house to "pick her up." Id. at 5–11. Jade Valentine becomes infatuated as she gets to know Tony better over exciting dates and interactions at school. See, e.g., id. at 33–38 (describing their movie date), 55 ("My girlfriends . . . saw the kisses Tony stole from me in the halls between classes.").

Racism and interracial tensions are central themes in their relationship, with Jade Valentine's parents and friends all disapproving of her white boyfriend. See, e.g., id. at 65–67 (Jade Valentine's mother tells her to stop seeing Tony), 75–77 (a friend tells Jade Valentine that she should have found a Black boyfriend). In fact, her mother initially turns Tony away. Id. at 5–6 ("That boy—the white one—he came to our house, walked up the steps, and he told me he was here to pick you up. . . . I said, 'No the fuck you aren't'"). Jade Valentine's mother expresses her disapproval several times, including in the following conversation, which she and Jade Valentine share on Christmas Eve.

> [Mother]: I don't like him, and I want you to get rid of him.
>
> . . .
>
> [Jade]: But why momma? He's nice and smart. He treats me well. Isn't that what you want for me?
>
> [Mother]: But he's white. He's going to go onto college and forget about you. He's going to marry a white woman, they are going to have white children, and the world will go on. Baby, you're mysterious to him. You're exotic. He's charming. I know, but he's going to get what he wants from you. After that, he's going to leave. . . . Don't . . . be a story he tells his friends.
>
> . . .
>
> [Jade]: But momma, I love him, and he's different.
>
> [Mother]: Baby, they're all different at first. Just live a little longer, and you'll see. You have power between your thighs. A power that some men will fall for, but the most powerful thing you own is in your spirit. You can't just let anyone in.

Id. at 65–67. Jade Valentine's father also disapproves. See id. at 172–76. ("Get rid of

him! . . . I just don't like him. . . . [G]uys like him are a dime a dozen."). Jade Valentine herself sometimes questions Tony's intentions and wonders if he is interested because of her Blackness.  See, e.g., id. at 3–4 ("[B]lack is [B]lack.  Maybe he was curious.  Maybe [Tony] wanted some chocolate-vanilla swirl.  Hell, it could have been that.").  Still, she is undeterred and declares her love for Tony.  Id. at 57–59.

The relationship is soon marked by turbulence and promiscuity.  Jade Valentine and Tony break up for the first time in March of their senior year, largely because Tony believes that they are too young for love.  See id. at 96–102.  Although Jade Valentine attempts to occupy herself with school activities, she becomes "mad at life" and "angr[y] at people dictating the things [she] should be doing."  Id. at 111–18.  But this heartbreak is short-lived.  Even though Jade Valentine had tried to connect with other boys, she and Tony reunite when he asks her to be his prom date.  Id. at 140, 144–50.  The book takes a noticeably raunchy turn from this point, and Jade "start[s] imagining [Tony's] body in less than holy ways."  Id. at 151.  For instance, the novel describes their first sexual encounter in graphic detail, see id. at 152–58, and "[f]or the next few weeks up until prom, all of Chicago was [their] bedroom."  Id. at 159.  After the couple attends prom, they graduate from high school.  Id. at 172–73.  Their relationship and sexual escapades continue into the summer as she prepares to leave for college in Central Illinois.  Id. at 178–86.  Jade faces judgment for having a white boyfriend but is, again, unphased.

> People disapprovingly shook their heads as we walked by draped in our love. . . . Although the sun turned Tony's skin brown, he was still white.  Although my skin was fair, my hair was nappy and my ass was big. . . . Chicago could be so wonderful and yet so racist at times.  But fuck that. . . . I was invincible.

Id. at 178–79.  Jade subsequently leaves Chicago as the summer ends.  See id. at 186.

### a.    Jade Valentine: College and Beyond

No Fairy Tales' storyline next details Jade Valentine's journey through adulthood, beginning with her attempts to adapt to college life in a predominantly white community while maintaining a long-distance relationship with Tony.  See, e.g., id. at 188 ("Being

United States District Court
Northern District of California

overworked, underpaid, and undereducated had a terrible effect on my spirit.  I didn't have Tony to bounce me back.").  However, keeping in touch with Tony proves difficult because she must balance her coursework and three jobs to pay for tuition.  See id. at 190, 192.  After playing violin at an open mic night, Jade Valentine secures a paying gig with Eduardo, a disc jockey who regularly "spins" for a local club.  Id. at 192, 196–201.  Shortly thereafter, she and Tony break up again because Eduardo kissed her after their show.  Id. at 201–04, 205 (Tony exclaims, "You kissed someone!  You touched someone's lips!  You're a bitch, and I don't want to be with you anymore.").

Although Jade Valentine never "gets over" Tony, he is largely absent from the rest of the novel.  See generally id. at 209–64.  After their breakup, she distracts herself with several other men.  See id. at 211 ("I couldn't take it out on Tony, but I had to take it out on something.  My vagina was a viable option, and I just needed to get laid.  So I did."), 213–16.  Jade Valentine is also expelled from college because she cannot afford tuition.  Id. at 218.  While she struggles financially, Jade Valentine reluctantly enters a romantic relationship with a wealthy doctor, Raj, who promises to support her.  Id. at 221–30.  However, their relationship quickly deteriorates, and she experiences domestic and sexual violence.  See id. at 230–37.  Jade Valentine leaves Raj and moves back to Chicago after violently "crack[ing] [his] skull" in self-defense.  Id. at 236–38.  The novel then details Jade Valentine's difficulties in seeking abortion care after she learns she is pregnant with Raj's child.  Id. at 240–45.  After saying one last farewell to Tony, Jade Valentine eventually moves to Europe, where she becomes a renowned violinist and marries and divorces two European men.  See id. at 249–54.  The story ends with Jade Valentine both cursing out and professing her love for Tony, who has traveled to Paris with his wife to see her perform.  Id. at 258 ("[S]hut up you fucking douche.  You dumped me over a fucking phone conversation fifteen years ago. . . . Now you show up fucking married?"), 261 ("I love you.  I will always love you. . . . That will never change.").

### 2.    Defendants' Netflix Series: Family Reunion

Defendants created and first released Family Reunion, a television series, on the

United States District Court
Northern District of California

Netflix streaming platform on or about July 10, 2019.  Compl. ¶ 2; see Mot. at 2.  As of Whitehead's Complaint filing, the show spanned four seasons and thirty-four episodes[4] and is currently available for paying Netflix subscribers to view.  See Mot. at 2; Compl. ¶¶ 6, 8.  The show is a "fictional, family-friendly, lighthearted 1990s-style sitcom" set in Columbus, Georgia, in the modern day.  Mot. at 2–3.  It primarily follows the "tightknit, inter-generational, Black McKellan family" and has earned three NAACP Image Awards for Outstanding Children's Program.  Id. at 2.  The Court first summarizes the show below.  The Court then describes Jade McKellan, one of its main characters.  Lastly, the Court outlines the plotlines of Family Reunion that most relate to the case.

### a.  General Synopsis

Family Reunion revolves around eight members of the McKellan family: (1) Moz, a newly retired professional football player; (2) Cocoa, Moz's wife; (3) Jade, their fifteen-year-old daughter; (4) Shaka, their eldest son; (5) Mazzi, their youngest son; (6) Ami, their youngest daughter; (7) M'Dear, Moz's mother and the family matriarch; and (8) Jebediah, Moz's father, and a church pastor.  Id. at 2–3; RJN Ex. 2.

The show begins with Moz, Cocoa, and their three children moving from Seattle, Washington, to Columbus, Georgia, to be closer to Moz's family.  RJN Ex. 2 at Part 1, Episode 1.  Much of the series then focuses on the McKellans' humorous attempts to adjust to Southern life and living with M'Dear and Jebediah.  See Mot. at 3; see RJN Ex. 2.  Each episode typically features all eight key members of the McKellan family, but many have plotlines that more heavily focus on a few family members at a time.  See, e.g., RJN Ex. 2 at Part 2, Episode 5 (featuring Shaka's enrollment in a martial arts class after being targeted by bullies, while Jade McKellan starts a babysitting venture), Part 3, Episode 4 (M'Dear recounts memories to save a historical landmark).  Comical McKellan antics include the children trying to fit in at their new school, see, e.g., id. at Part 1, Episode 7;

---

[4]  Defendants released the fifth and final Part of Family Reunion after Whitehead filed her Complaint.  See Mot. at 2.  Because Whitehead does not allege that she had access to this unreleased season, the Court does not discuss this portion of the show.  See Compl.

the family learning about their family's religious practices, see, e.g., id. at Part 1, Episode 3; and Moz and Cocoa attempting to save money after learning that the family overspent their fortune, see, e.g., id. at Part 2, Episode 8.  At times, Family Reunion deviates from comedy to explore "serious issues concerning Black life and culture in the United States in a family-friendly manner, such as one episode that focuses on 'The Talk' that many Black parents have with their children about dealing with law enforcement officers."  Mot. at 3; see also, e.g., RJN Ex. 2 at Part 1, Episode 10 (Shaka and Mazzi are stopped by officers while mowing the lawn).  But overall, Family Reunion is a joyous, light-hearted show that portrays the heartwarming, and sometimes, annoying, experience of a multi-generational family learning to come together.  See generally RJN Ex. 2.

### b.     Jade McKellan

As Moz and Cocoa's eldest daughter, fifteen-year-old Jade McKellan plays a substantial role in the Family Reunion sitcom.  See Mot. at 2–3; RJN Ex. 2.  Jade McKellan is a confident, boy-crazy teenager who cannot wait to grow up.  See, e.g., RJN Ex. 2 at Part 1, Episode 1 (she quickly develops a crush on Drew, a non-white teenage resident of Columbus), Part 4, Episode 3 (she and her younger siblings travel to imaginary "Grown City," where she must learn to appreciate being a kid again before returning home).  Jade McKellan is Black, curvy, and the most light-skinned member of the immediate family.  See, e.g., id. at Part 1, Episode 8 (Jade McKellan enters a beauty pageant, which leads to a discussion with her mother about Black beauty—in its many forms).  Like other members of her family, Jade McKellan is a talented singer, see, e.g., id. at Part 2, Episode 6 (she auditions for "G Club" and sings an original song at an open mic night) and likes to stay fashionable, see, e.g., id. at Part 3, Episode 6 (Jade becomes a stylist and gives her grandmother a makeover).  She is very close to her parents, who are still married, but she sometimes disobeys them.  See, e.g., id. at Part 2, Episodes 6–9 (even though her parents disapprove, Jade McKellan continues to see Royale, a non-white boyfriend, for what appears to be several weeks).  Still, Jade McKellan maintains a light, positive demeanor and never mutters expletives or sexual statements.  See generally RJN

9

Ex. 2.

### c.   Relevant Storyline: An Interracial Love Interest

The Court now briefly summarizes the plotline of Part 2, Episode 4 (titled, "Remember When Jade was Down with the Swirl"), in which Jade McKellan has a controversial "crush" on a white classmate.  Id. at Part 2, Episode 4.

In the episode, Jade McKellan is infatuated with her white chemistry lab partner, Cody, but receives criticism from family and classmates.  Id.  The story begins with Jade bringing Cody home to study, where he meets her mother (Cocoa), father (Moz), and grandmother (M'Dear).  Id.  Cocoa is receptive and encouraging of Jade McKellan's interest in Cody.  Id.  Although Jade and Cody are just friends at this point, Moz and M'Dear immediately disapprove of any relationship between them.

> [M'Dear]: So, are we gonna just ignore the white elephant in the room? . . . What happened to Drew or that sweet Kurt boy? You know, the Black ones?
>
> [Cocoa]: I'm sorry, are you seriously trying to give my daughter an anti-interracial dating talk?
>
> . . .
>
> [Jade]: Why don't you like Cody?
>
> [Moz]: Oh, I like him.  I just don't like him for you.
>
> [Jade]: Just because he's white?
>
> . . .
>
> [Cocoa]: As long as Jade likes him, and he treats her well, the race of the person she's going out with shouldn't matter.
>
> [M'Dear]: Cocoa, you have to remember where you are.  Now there are some folk in these parts who are not as open-minded as they are on that West Coast.
>
> . . .
>
> [Cocoa]: There are closed-minded people everywhere.
>
> [Moz]: You're right.  There are plenty of people, white and Black, who would start trouble with them for dating outside of their race.

United States District Court
Northern District of California

1      [Jade]: Wow, I knew you guys were old school, but I didn't
       realize you were racist.

2    Id.

3          Once at school, Jade McKellan tells a friend about Moz and M'Dear's views.  Id.

4    Her friend supports her crush on Cody, and both girls hope that he will ask Jade McKellan

5    to the school dance.  Id.  However, other girls at the high school notice Jade McKellan's

6    interest in Cody and tell her that they disapprove.  Id.  Cody eventually asks Jade to be his

7    date at the school dance, but he is interrupted by a disapproving classmate selling flavored

8    frozen yogurt.  Id. (sarcastically telling Jade McKellan, "I bet you want the swirl.").  Jade

9    McKellan sees other students shaking their heads in disapproval and rejects Cody's

10   invitation.  Id.

11         At the dance, Jade McKellan regrets denying Cody and feels "bummed."  Id.

12   Cocoa, working at the dance as an adult chaperone, then encourages Jade Mckellan to tell

13   Cody how she feels using a grand gesture.  Id.  Jade McKellan follows her mother's advice

14   and tells Cody that she likes him in front of everyone.  Id.  But despite her efforts, Cody

15   rejects her.  Id.  The episode concludes with Cocoa and Jade McKellan having a heartfelt

16   conversation in the school hallway.  Id. (The conversation includes Cocoa jokingly saying,

17   "Brought you some fro-yo.  They were all out of the swirl.").  Id.  This is the only episode

18   in which Cody makes an appearance or Jade McKellan expresses an interest in interracial

19   dating.[5]  See generally RJN Ex. 2.

20   **II.   LEGAL STANDARD**

21         Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may dismiss

22   a complaint for failure to state a claim upon which relief may be granted.  The Court may

23   _____

24   [5]  However, this episode of Family Reunion is not the only one that features elements of interracial
     relationships.  In Part 1, Episode 6 ("Remember That Crazy Road Trip?"), which depicts the

25   family's arduous journey from Seattle to Columbus, Georgia, Jade McKellan has a minor "crush"
     on a server at a restaurant in Idaho.  RJN Ex. 2 at Part 1, Episode 6.  However, before the waiter

26   can get Jade McKellan's number, she finds out that he is a polygamist, and she quickly abandons
     any interest in him.  See id.  Additionally, in Part 1, Episode 9 ("Remember Black Elvis?")

27   M'Dear briefly reveals that the McKellan family history includes an interracial couple that
     experienced prejudice.  Id. at Part 1, Episode 9.  However, this story was only a small element of

28   the episode, which primarily focused on other ancestral stories that lacked any interracial
     dimensions.  See id.

United States District Court
Northern District of California

base dismissal on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019) (cleaned up).

A complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (cleaned up). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a 12(b)(6) motion. Id. (citing Twombly, 550 U.S. at 555). When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). A court has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008).

Courts must construe pro se pleadings liberally and hold such pleadings to a less stringent standard than those drafted by attorneys. Boag v. MacDougall, 454 U.S. 364, 365 (1982) (per curiam); Hughes v. Rowe, 449 U.S. 5, 9 (1980) ("It is settled law that the allegations of [a pro se litigant's complaint] 'however inartfully pleaded' are held 'to less

1  stringent standards than formal pleadings drafted by lawyers . . . .'" (quoting Haines v.

2  Kerner, 404 U.S. 519, 520 (1972))).  A court should dismiss a pro se complaint if "it is

3  absolutely clear that the deficiencies of the complaint could not be cured by amendment."

4  Akhtar v. Mesa, 698 F.3d 1202, 1212 (9th Cir. 2012).

5  **III.    DISCUSSION**

6       The Court considers (A) Defendants' Request for Judicial Notice and Incorporation

7  by Reference and (B) Defendants' Motion to Dismiss in turn.

8       **A.    Request for Judicial Notice and Incorporation by Reference**

9       Defendants request that the Court take judicial notice and incorporate by reference

10  (1) Whitehead's novel, No Fairy Tales; (2) DVDs containing each episode of Defendants'

11  Netflix series, Family Reunion; and (3) Whitehead's Arizona Bar membership webpage.

12  RJN at 1–2; RJN Exs. 1–3.  Whitehead opposes Defendants' request as to No Fairy Tales

13  and Family Reunion, arguing that judicial notice is improper because the facts in the

14  materials are disputed and that "it [would] unfairly make[] a motion to dismiss a motion

15  for summary judgment."  Opp'n at 6.  Whitehead does not address Defendants' request

16  regarding incorporation by reference or her Arizona Bar membership page.  See Opp'n.

17       Generally, "a district court may not consider any material beyond the pleadings in

18  ruling on a Rule 12(b)(6) motion."  Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th

19  Cir. 2001).  But "[t]here are two doctrines that permit district courts to consider material

20  outside the pleadings without converting a motion to dismiss into a motion for summary

21  judgment: judicial notice under Federal Rule of Evidence 201 and incorporation by

22  reference."  In re Google Assistant Privacy Litig., 457 F. Supp. 3d 797, 812 (N.D. Cal.

23  2020).  Courts may take judicial notice of facts that are "not subject to reasonable dispute"

24  because they (1) are "generally known within the trial court's territorial jurisdiction," or

25  (2) "can be accurately and readily determined from sources whose accuracy cannot

26  reasonably be questioned."  Fed. R. Evid. 201(b).  "Matters of public record may be

27  judicially noticed, but disputed facts contained in those records may not."  Metaxas v. Lee,

28  503 F. Supp. 3d 923, 934 (N.D. Cal. 2020) (citing Khoja v. Orexigen Therapeutics, Inc.,

United States District Court
Northern District of California

13

899 F.3d 988, 999 (9th Cir. 2018)).

The incorporation-by-reference doctrine allows courts to consider certain materials "as though they are part of the complaint itself." Khoja, 899 F.3d at 1002. Materials are subject to incorporation by reference if a plaintiff refers to them "extensively" or they form the basis of the complaint. Id. Unlike documents subject to judicial notice, courts may properly assume the truth of materials incorporated by reference. Id. at 1003. But "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." Id. The Ninth Circuit has extended the incorporation-by-reference doctrine to include circumstances in which "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege [its] contents . . . in the complaint." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (citations omitted).

Courts frequently employ judicial notice and the incorporation-by-reference doctrine to consider the content of materials in copyright infringement cases at the motion to dismiss stage. See, e.g., Thomas v. Walt Disney Co., 337 F. App'x 694, 695 (9th Cir. 2009) (affirming the district court's grant of judicial notice of a literary work and motion picture on the defendants' motion to dismiss); Campbell v. Walt Disney Co., 718 F. Supp. 2d 1108, 1111 n.3 (N.D. Cal. 2010) (granting defendants' request of judicial notice for a motion picture and a screenplay to evaluate the defendants' motion to dismiss); Smith v. AMC Networks, Inc., 18-CV-03803-LHK, 2019 WL 402360, at *3–4 (N.D. Cal. Jan. 31, 2019) (granting judicial notice of comic books, a graphic novel, and a television series "under the incorporation by reference doctrine recognized in Knievel.").

Here, the Court incorporates by reference (1) No Fairy Tales and (2) Family Reunion because Whitehead refers to both works extensively and because they form the basis of her Complaint. See Khoja, 899 F.3d at 1002. As Defendants point out, Whitehead refers to No Fairy Tales and Family Reunion in nearly every paragraph of her Complaint. See Mot. at 3; Compl. ¶¶ 1–6, 8–9. Although Whitehead does not describe

14

either work in detail, see Compl., she alleges that Defendants have infringed on her copyright by impermissibly taking the contents of her work. See Compl. ¶¶ 2, 4, 9(B); see also Khoja, 899 F.3d at 1002 (citing Knievel, 393 F.3d at 1076).

In addition, Whitehead does not dispute the works' authenticity or relevance. See Knievel, 393 F.3d at 1076. While Whitehead does not engage with the incorporation-by-reference doctrine, see Opp'n, she argues that judicial notice is inappropriate because No Fairy Tales and Family Reunion constitute "evidence that is in material dispute with one another. The material dispute: Defendants infringed on [her] exclusive copyrights." Id. at 6. This argument does not challenge the authenticity of the works; the truthfulness of content is distinct from an ability to support a copyright infringement claim. See Knievel, 393 F.3d at 1076. Moreover, because Whitehead's claim depends on a comparison of the works, they are necessary to the case. See Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin, 952 F.3d 1051, 1064 (9th Cir. 2020) ("Skidmore") (establishing the elements of copyright infringement).

The Court also takes judicial notice of the online record of Whitehead's Arizona Bar membership page because it is a public record that "can be accurately and readily determined from sources whose accuracy cannot be readily questioned."[6] Fed. R. Evid. 201(b); Metaxas, 503 F. Supp. 3d at 934. Courts in this District commonly take judicial notice of attorney bar membership pages and their contents. See, e.g., Morgensen v.

---

[6] While Whitehead's online Arizona Bar membership page shows that she was once an attorney with her own law firm, the Court will not use this information to "consider whether [she] should be entitled to the same treatment as non-lawyer pro se plaintiffs" as Defendants suggest. Mot. at 5; RJN Ex. 3. The bar membership page neither shows that Whitehead is currently a licensed attorney nor establishes that she has familiarity with the relevant law based on her prior experience. See RJN Ex. 3; cf Rossmann v. Donaldson, 16-CV-1118-D, 2016 WL 6605148, at *1 (W.D. Okla. Oct. 4, 2016), report and recommendation adopted, 16-CV-1118-D, 2016 WL 6603253 (W.D. Okla. Nov. 8, 2016) (holding that licensed attorneys representing themselves are not entitled to the same liberal treatment as pro se litigants if they are registered members of the bar); Martin-Trigona v. Shiff, 702 F.2d 380, 389 (2d Cir. 1983) (declining to make allowances for a plaintiff who was a law school graduate and demonstrated familiarity with substantive and procedural law). The Ninth Circuit has not outlined how to treat pro se litigants like Whitehead. See Osgood v. Main Street Mktg., LLC, 16-CV-2415-GPC (BGS), 2017 WL 131829, *3–4 (S.D. Cal. Jan. 13, 2017). Thus, the Court still liberally construes Whitehead's pleadings like other pro se litigants. See id.; Boag, 454 U.S. at 365.

United States District Court
Northern District of California

Downey Sav. & Loan Ass'n, 15-CV-02000-HRL, 2016 WL 234430, at *2 n.5 (N.D. Cal. Jan. 20, 2016) ("[T]he State Bar of California's records posted on its website . . . shows that each of Greenwich's attorneys of record is an active licensed member of the bar.  This court takes judicial notice of those records.").

Accordingly, the Court GRANTS Defendants' Request for Judicial Notice and Incorporation by Reference.

### B.  Motion to Dismiss

Whitehead alleges that Defendants infringed on the copyright of No Fairy Tales by "turning [it] into moving pictures or episodes" when creating Family Reunion.  Compl. ¶ 2.  Defendants move to dismiss Whitehead's Complaint, arguing that her allegations are speculative and conclusory, and that a comparison of No Fairy Tales and Family Reunion reveals no substantial similarities between the works.  Mot. at 1.  In response, Whitehead asserts that her Complaint sufficiently conforms to pleading requirements under Rule 8 of the Federal Rules of Civil Procedure, and that the Court cannot review the works at the motion to dismiss stage.[7]  Opp'n 4–6.

The Court first addresses whether it may assess infringement on a motion to dismiss.  Because the Court incorporates No Fairy Tales and Family Reunion into Whitehead's Complaint by reference, the Court will follow substantial Ninth Circuit case law that answers this question in the affirmative.  Second, the Court examines whether Whitehead plausibly alleges that Defendants infringed on her copyright.  As discussed below, Whitehead does not, and cannot, plausibly state a claim of copyright infringement regarding the works in question.  Therefore, the Court GRANTS Defendants' Motion to Dismiss without leave to amend.

---

[7]  Whitehead also argues that "Defendants waived their Motion to Dismiss when they filed a notice to consider extrinsic evidence outside of the pleadings and thereby unfairly making their motion to dismiss a motion for summary judgment."  Opp'n at 5.  Whitehead does not cite case law in support of this contention.  Id.  Whitehead also fails to consider the incorporation-by-reference doctrine, which allows courts to consider on a motion to dismiss materials not attached to a complaint.  See id.; see also Tellabs, Inc., 551 U.S. at 322.  As discussed, the Court may incorporate the works into Whitehead's Complaint and deems Whitehead's assertion meritless.  See Thomas, 337 F.3d App'x at 695.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.    Copyright Infringement on a Motion to Dismiss

Defendants encourage the Court to rule on the issue of infringement at the pleading stage, arguing that the works are not substantially similar.  Mot. at 5; Reply at 1. Whitehead argues that this analysis is more appropriate at summary judgment.  See Opp'n at 5–6.

"[W]hen the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss."  Christianson v. West Pub. Co., 149 F.2d 202, 203 (9th Cir. 1945). Christianson is still good law.  In the years since Christianson, the Ninth Circuit has regularly affirmed dismissals of copyright infringement claims when a comparison of the works—whether attached to a complaint or incorporated by reference—shows that they are not substantially similar as a matter of law.  See, e.g., Masterson v. Walt Disney Co., 821 F. App'x 779, 780, 780 n.1 (9th Cir. 2020) (listing ten additional unpublished opinions); Carlini v. Paramount Pictures Corp., 21-CV-55213, 2022 WL 614044, at *1–2 (9th Cir. Mar. 2, 2022), cert. denied, No. 21-CV-1519, 2022 WL 4651860 (U.S. Oct. 3, 2022).

However, the Ninth Circuit has cautioned against dismissal when comparing the works reveals exceedingly close issues of fact.  Zindel as Tr. for David Zindel Tr. v. Fox Searchlight Pictures, Inc., 815 F. App'x 158, 159 (9th Cir. 2020).  This determination "is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. (quoting Iqbal, 566 U.S. at 679).  There will be times when a court finds it plausible that the works are substantially similar and that discovery might be useful.  Id.  But a court may also see "that the claims are not plausible and that a comparison of two works creates no more than a 'mere possibility of misconduct.'"  Id. (cleaned up).

In light of this case law and the stark differences between the works, the Court will use No Fairy Tales and Family Reunion—both of which are before the Court by way of incorporation by reference—to make a non-infringement determination at the dismissal stage.  See, e.g., Masterson, 821 F. App'x at 780, 780 n.1 (listing cases); DuMond v.

17

Reilly, 19-CV-8922-GW-AGRX, 2021 WL 4772986, at *2–3 (C.D. Cal. Jan. 8, 2021)
(dismissing a copyright infringement claim after reviewing disputed works via the
incorporation-by-reference doctrine).  Whitehead does not address the weight of existing
Ninth Circuit opinions on this issue.  See Opp'n.

### 2.    Copyright Infringement Analysis

To state a claim for copyright infringement, a plaintiff must allege: "(1) that [they]
own[] a valid copyright in [their work]; and (2) that [the defendants] copied protected
aspects of the work."  Skidmore, 952 F.3d at 1064 (citing Rentmeester v. Nike, Inc., 888
F.3d 1111, 1116–17 (9th Cir. 2018)).  Defendants do not challenge Whitehead's ownership
of a valid copyright in No Fairy Tales.  See Mot.; Compl. ¶ 1.  Rather, the dispute in this
case centers on the second prong, which itself has two distinct components: (a) "copying"
and (b) "unlawful appropriation."  See Skidmore, 952 F.3d at 1064.  Defendants argue that
Whitehead does not—and cannot—plausibly allege (a) that Defendants accessed, and
thereby, copied No Fairy Tales or (b) that Defendants unlawfully appropriated her novel.
See Mot. at 1; Reply at 1–2.

The Court examines the "copying" and "unlawful appropriation" prongs in turn.
Because the Court agrees that Whitehead has not, and cannot, plausibly alleged that
Defendants "copied" or "unlawfully appropriated" No Fairy Tales, the Court GRANTS
Defendants' Motion to Dismiss without leave to amend.

### a.    Copying

"In the absence of direct evidence of copying, . . . the plaintiff can attempt to prove
it circumstantially by showing [(1)] that the defendant had access to the plaintiff's work
and [(2)] that the two works share similarities probative of copying."  Skidmore, 952 F.3d
at 1064 (cleaned up).

To establish access, plaintiffs must allege facts that show that an alleged infringer
had "a reasonable possibility, not merely a bare possibility" of viewing the protected work.
Art Attacks Ink, LLC v. MGA Ent. Inc., 581 F.3d 1138, 1143 (9th Cir. 2009).  When
evidence of such access is circumstantial, plaintiffs may either present "a chain of events

linking the plaintiff's work and the defendant's access, or . . . show[] that the plaintiff's work has been widely disseminated." Id.

Whitehead relies on the wide dissemination theory of access. See Compl. ¶ 3. Where a work is available on the internet, the Ninth Circuit has "recognize[d] the power of the internet to reach a wide and diverse audience," but has also held that online availability "is not sufficient to demonstrate wide dissemination." Art Attacks Ink, 581 F.3d at 1145. "In most cases, the evidence of widespread dissemination centers on the degree of a work's commercial success and on its distribution through radio, television, and other relevant mediums." Loomis v. Cornish, 836 F.3d 991, 997 (9th Cir. 2016); see also, e.g., Griffin v. Peele, 17-CV-01153-JGB (KKx), 2017 WL 823124, at *6 (C.D. Cal. Oct. 18, 2017) (holding that the mere allegation of online availability did not establish wide dissemination absent information about "how many books were sold, or copies viewed or downloaded"). But in 2020, the Ninth Circuit appeared more lenient.

> [T]he concept of "access" is increasingly diluted in our digitally interconnected world.  Access is often proved by the wide dissemination of the copyrighted work. [Loomis, 836 F.3d at 995].  Given the ubiquity of ways to access media online, from YouTube to subscription services like Netflix and Spotify, access may be established by a trivial showing that the work is available on demand.

Skidmore, 952 F.3d at 1068 (emphasis added).  The Ninth Circuit has not clarified how "trivial" a showing this may be.  In fact, it appears that no court has found widespread dissemination based on online availability alone, following Skidmore.  See Lois v. Levin, 22-CV-00926-SVW-ADS, 2022 WL 4351968, at *3 (C.D. Cal. Sept. 16, 2022).

To establish "similarities probative of copying," a plaintiff may allege similarity between both the protectable and unprotectable elements of disputed works.[8]  Skidmore, 952 F.3d at 1064.  Such "similarities between the two works need not be extensive, . . .

---

[8] Conversely, the Court may only consider the similarities between protectable elements of disputed works when evaluating the separate issue of substantial similarity under "unlawful appropriation."  Carlini v. Paramount Pictures Corp., ("Carlini I") 19-CV-08306-SB-RAP, 2021 WL 911684, at *7 (C.D. Cal. Feb. 2, 2021), aff'd, 21-CV-55213, 2022 WL 614044.

[t]hey just need to be similarities one would not expect to arise if the two works had been created independently." Rentmeester, 883 F.3d at 1117 (citations omitted).

The Court concludes that Whitehead cannot adequately allege either "access" or "substantial similarities probative of copying" to satisfy copyright infringement's "copying" prong. See Skidmore, 952 F.3d at 1064. The Court addresses Whitehead's allegations regarding Defendants' access to No Fairy Tales in the paragraphs that follow. However, the Court reserves its discussion of any alleged "similarities probative of copying" in the next section of this Order and finds that any commonalities between the works are merely coincidental.

Whitehead alleges that Defendants had access to No Fairy Tales because she used Amazon's self-publishing services in 2015, and Amazon distributed her novel to "millions of Amazon Kindle subscribers, Amazon Prime subscribers, and direct purchasers." Compl. ¶ 3. Defendants argue that Whitehead fails to allege more than a "bare possibility" that Defendants had access to No Fairy Tales. Mot. at 7–8. As Defendants point out, Whitehead has not alleged the numbers of books sold, viewed, or downloaded. Id. (citing Griffin, 2017 WL 8231241, at *6); Reply at 4 (citing Loomis, 836 F.3d at 997). Additionally, even if Whitehead's book is available online, Defendants contend that this does not show a reasonable possibility that they accessed the work; "[Whitehead's] novel does not crack the top four million book sales on Amazon." [9] Mot. at 8; Reply at 4. Whitehead argues that her allegations sufficiently allege access because "Amazon . . . is the world's leading retailer of books and . . . any [Amazon] Prime subscriber," including Defendants, may have downloaded the book for a "nominal fee" without her knowledge. Opp'n at 7.

While the Court may interpret Skidmore's language to mean that Whitehead sufficiently alleges access via wide dissemination, see 952 F.3d at 1068, it is not inclined to adopt this interpretation. See Lois, 2022 WL 4351968, at *3 (reaching the same

---

[9] A link to No Fairy Tales' Amazon web page is available at Clark Decl. ¶ 4.

conclusion in a similar post-Skidmore copyright infringement case).  First, like the court in Lois, the Court cannot find a single court that has used the language in Skidmore to hold that online availability is sufficient to establish widespread dissemination.  See id. at *4. Second, the Court agrees that this "interpretation would not only conflict with established [c]ourt practice, inside and outside of this Circuit, but also would eviscerate the distinction between a reasonable possibility of access and a bare possibility of access."  See id. at 3–4 (listing six cases holding that online availability does not sufficiently establish wide dissemination); see also, e.g., Loomis, 836 F.3d at 997 (requiring a showing of commercial success to establish widespread dissemination); Griffin, 2017 WL 823124, at *6 (same).

Accordingly, the Court concludes that Whitehead has not alleged the wide dissemination of No Fairy Tales.  Whitehead does not allege any facts related to the success her novel has experienced due to its online availability (e.g., number of copies sold, viewed, or downloaded) as historically required by courts in this Circuit.  See Compl. ¶ 3; Opp'n at 7; see also, e.g., Loomis, 836 F.3d at 997("[E]vidence of widespread dissemination centers on the degree of a work's commercial success and on its distribution through radio, television, and other relevant mediums.").  Because Whitehead does not adequately allege wide dissemination, she fails to allege that Defendants accessed her work.[10]  See Art Attacks Ink, 581 F.3d at 1145.

Even if the Court interprets Skidmore to mean that Whitehead sufficiently alleges access "by a trivial showing that the work is available on demand," see Skidmore, 952 F.3d at 1068, access is but one component of "copying."  Id. at 1064.  Whitehead must also plausibly allege "that the two works share similarities probative of copying."  See id. (cleaned up).  As discussed below, Whitehead cannot do so because No Fairy Tales and Family Reunion only share similarities that can be expected to arise even if the works were created independently.  See Rentmeester, 883 F.3d at 1117.

_____

[10]  The Ninth Circuit has affirmed a district court's grant of a motion to dismiss for a plaintiff's failure to allege access.  See Mintz v. Subaru of Am., Inc., 716 F. App'x 618 (9th Cir. 2017). However, given the uncertainty of the language in Skidmore, the Court proceeds with the remaining "copying" and "unlawful appropriation" analyses.  See 952 F.3d at 1064.

1    Consequently, the Court holds that Whitehead fails to sufficiently allege "access" or

2    "similarities probative of copying" to satisfy the "copying" component of a copyright

3    infringement claim.  See id.; Skidmore, 952 F.3d at 1064.

4                    b.    Unlawful Appropriation

5    Defendants next argue that, even if Whitehead sufficiently alleges access, the Court

6    must dismiss her Complaint because No Fairy Tales and Family Reunion "are entirely

7    dissimilar in their protectable expression."  Mot. at 8.  To reiterate, "[i]n copyright

8    infringement cases where the court judicially notices the works at issue and it is clear there

9    is no substantial similarity between them as a matter of law, dismissal of the claims is

10   proper."  Gallagher v. Lions Gate Ent. Inc., 15-CV-02739-ODW (Ex), 2015 WL

11   12481504, at *2 (C.D. Cal. Sept. 11, 2015) (citing Christianson, 149 F.2d at 203).  Courts

12   have regularly done so after considering the allegations in a complaint and independently

13   comparing disputed works.  See, e.g., id. at *15 (granting a motion to dismiss without

14   leave to amend after finding no substantial similarity between a literary work and a motion

15   picture).  Thus, dismissal on the grounds of "substantial similarity" is warranted if, "as a

16   matter of law[,] the similarities between the two works are only in uncopyrightable

17   material or are de minimis."  Zindel, 815 F. App'x at 159.

18   To establish "unlawful appropriation," a plaintiff must plausibly allege that "the

19   works share substantial similarities."  Skidmore, 952 F.3d at 1064 (emphasis added).  The

20   Ninth Circuit uses a two-part test to assess substantial similarity: the extrinsic test and the

21   intrinsic test.  Id.

22   First, courts apply an extrinsic test, "compar[ing] the objective similarities of

23   specific expressive elements in the two works."  Id. (cleaned up).  The extrinsic test is

24   objective in nature and requires courts to distinguish between the works' protectable and

25   unprotectable elements; generally, plaintiffs must allege substantial similarities in disputed

26   works' protectable elements to plausibly allege copyright infringement.  See Rentmeester,

27   883 F.3d at 1118.  Protectable elements include "the plot, themes, dialogue, mood, setting,

28   pace, characters, and sequence of events' in the two works."  Funky Films, Inc. v. Time

United States District Court
Northern District of California

22

United States District Court
Northern District of California

_Warner Ent. Co._, 462 F.3d 1072, 1077 (9th Cir. 2006), overruled on other grounds by _Skidmore_, 952 F.3d at 1079.  Unprotectable elements include material in the public domain, historical facts, common phrases, elements treated as fact in the original work, scenes a faire,[11] and "stock scenes and themes that are staples of literature."  _Corbello v. Valli_, 974 F.3d 965, 971, 975 (9th Cir. 2020) (quoting _Benay v. Warner Bros. Ent., Inc._, 607 F.3d 620, 624–25 (9th Cir. 2010), overruled by other grounds by _Skidmore_, 952 F.3d at 1079)).  Essentially, "[i]n applying the extrinsic test, . . . court[s] 'compare[], not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'"  _Funky Films_, 462 F.3d at 1077 (quoting _Berkic v. Crichton_, 761 F.2d 1289, 1293 (9th Cir. 1985)).  However, "[s]elections or arrangements of unprotected elements may be protected where 'the works share, in substantial amounts, . . . the same[] combination of unprotectable elements.'"  _Hathaway v. Caputo_, 20-CV-00055-TUC-DTF, 2021 WL 1862248, at *6 (D. Ariz. May 10, 2021) (quoting _Skidmore_, 952 F.3d at 1075) (cleaned up).  But shared ideas and concepts, even in combination, do not constitute substantial similarity if such arrangements naturally flow from a basic plot premise.  _Skidmore_, 952 F.3d at 1075.

Second, the intrinsic test is reserved for factfinders, who examine the works' "similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance."  _Id._ at 1064 (cleaned up).  The intrinsic test is much more subjective, and courts may not apply the intrinsic test at the motion to dismiss stage.  _See id._; _Masterson_, 821 Fed. App'x at 782.  Although both the extrinsic and intrinsic tests must be satisfied to adequately establish substantial similarity, _Skidmore_, 952 F.3d at 1064, the Ninth Circuit has held that courts may rule on substantial similarity using only the extrinsic test at the motion to dismiss stage.  _See Masterson_, 821 Fed. App'x at 782.  Therefore, the Court exclusively employs the extrinsic test here.

Defendants argue that the Court must dismiss Whitehead's Complaint because

---

[11]  Scenes a faire are "situations and incidents that flow necessarily or naturally from a basic plot premise."  _Cavalier v. Random House, Inc._, 297 F.3d 815, 823 (9th Cir. 2002)

United States District Court
Northern District of California

"both the works' content and her unsubstantiated claims of infringement" do not satisfy the extrinsic test for substantial similarity. Mot. at 9. Specifically, Defendants fault Whitehead for failing to describe any similarities between No Fairy Tales and Family Reunion in her Complaint. Id.; Reply at 2–3. They also argue that a comparison of the works reveals "that the only apparent similarity" between the works is that they feature a Black character named Jade. Mot. at 9 (emphasis in original). Whitehead responds that providing extensive detail about the works' similarities is unnecessary and "too encumbering" at this stage. Opp'n at 5. She also contends that she alleged substantial similarity by including details about her reaction to viewing Family Reunion in her Complaint.[12] See id. at 7–8; Compl ¶ 4 (Whitehead alleges that she "felt so violated that [she] was repetitively screaming at the TV . . . and sobbing.").

The Court next considers the allegations in Whitehead's Complaint and applies the extrinsic test.[13] See Compl; Exs. 1–2. As discussed below, the Court concludes both that Whitehead fails to plausibly allege that No Fairy Tales and Family Reunion are substantially similar and that they are not substantially similar as a matter of law. See Gallagher, 2015 WL 12481504, at *15. Consequently, the Court also holds that Whitehead does not—and cannot—plausibly allege "unlawful appropriation" of No Fairy Tales. See Skidmore, 952 F.3d at 1064.

---

[12] Whitehead does not provide any case law indicating that a plaintiff's subjective reaction to seeing alleged infringement is at all related to the substantial similarity analysis. See Opp'n 7–8. On the contrary, as Defendants argue, Ninth Circuit authority indicates that Whitehead's personal feelings are irrelevant to adequately pleading substantial similarity. See Reply at 5–6; see also Shame on You Prods., Inc. v. Banks, 893 F.3d 661, 667 (9th Cir. 2018) ("Because [the extrinsic] test is objective, [the plaintiff's] subjective beliefs regarding its outcome are no more relevant to the reasonableness determination than a party's subjective belief regarding any other legal test."); Zindel v. Fox Searchlight Pictures, Inc., 18-CV-1435 PA (KSx), 2018 WL 6074566, at *3 (C.D. Cal. Oct. 26, 2018) ("Because the dismissal of the complaint was based on the [c]ourt's determination that the [f]ilm and [b]ook were not objectively similar to the [p]lay in their protectable elements, the subjective beliefs of third-party viewers (and of [the] [p]laintiff) are irrelevant."). The Court therefore holds that Whitehead's allegations concerning her reaction to Family Reunion are irrelevant to pleading substantial similarity. See Shame on You, 893 F.3d at 667.
[13] As discussed above, the Court may consider the contents of No Fairy Tales and Family Reunion even though Whitehead does not attach either work to her Complaint under the incorporation-by-reference doctrine. See Thomas, 337 F.3d App'x at 695.

### i.        Plot

Whitehead alleges that she "noticed that Family Reunion had substantial similarities with [No Fairy Tales] such as . . . [the] plots and obstacles that the main character had with other characters."  Compl. ¶ 4.  As Defendants argue, this allegation is conclusory because Whitehead does not provide any facts detailing how the plots or obstacles in the works are similar.  See Mot. at 11; see also Iqbal, 556 U.S. at 678.

After reviewing both works, Defendants argue that the plotlines in No Fairy Tales are not "similar in any way" to the plotlines in Family Reunion.  Mot. at 10.  Defendants further contend that, even if both works involve interracial relationships, this commonality cannot support a finding of substantial similarity because "interracial relationships" are highly generalized plotlines and scenes a faire, and are thus, unprotectable under copyright law.  Reply at 6–7.  The Court agrees.

Courts applying the extrinsic test must look "beyond the vague, abstracted idea of a general plot" to assess substantial similarity.  Berkic, 761 F.2d at 1293.  The Ninth Circuit has frequently rejected claims of substantial similarity where disputed works' plotlines had similarities "but developed quite differently."  See Funky Films, 462 F.3d at 1077–78; see also DuMond, 2021 WL 4772986, at *14 (listing cases).

The plots of Whitehead's No Fairy Tales and Defendants' Family Reunion are incredibly different.

At a high level, No Fairy Tales is a coming-of-age story that follows the life of a Black teenager, Jade Valentine, from the time she is a high school senior until she is an established adult.  RJN Ex. 1 at 3, 81; see generally id.  Jade Valentine is No Fairy Tales' only main character.  See RJN Ex. 1.  The initial 186 pages of the novel focus on Jade Valentine's tumultuous interracial relationship and her attempts to secure a violin scholarship.  Id. at 1–186.  The rest of the book focuses on Jade Valentine's struggle to adapt to college life without her high school sweetheart, involvement in sexual exploits, experiences with domestic violence, and transformation into a successful violinist living in Europe.  Id. at 187–261.

Family Reunion is a 1990s-style sitcom that follows the lives of eight members of a Black family—Moz, Cocoa, Jade, Shaka, Mazzi, Ami, M'Dear, and Jebediah—over the course of three or four years.  Mot. at 3, 15; see generally RJN Ex. 2.  Jade McKellan is a teenager, and Shaka, Mazzi, and Ami are all middle or elementary school children.  See generally RJN Ex. 2.  Much of the show centers around the "culture shock" the family experiences after moving from Seattle, Washington to Columbus, Georgia, including learning how to live with Moz's traditional and religious parents.  Mot. at 11; see RJN Ex. 2.  The family also faces financial hardship after realizing that they nearly depleted the fortune Moz acquired as a professional football player.  See, e.g., RJN Ex. 2 at Part 2, Episode 9 (a financial advisor tells the family to tighten their belts).  While nearly every episode features all members of the McKellan family, each character has their own storylines (both in individual episodes and throughout the series).  See generally id.  The most relevant plotlines in this case involve Jade McKellan, the family's oldest daughter, including one episode in which she has a controversial "crush" on a white classmate.  See id. at Part 2, Episode 4.

No Fairy Tales and Family Reunion tell very different stories.  See Funky Films, 462 F.3d at 1077–78.  First, all plotlines within No Fairy Tales emanate from one main character—Jade Valentine, whereas the plotlines of Family Reunion revolve around eight family members.  See generally RJN Exs. 1–2; see also Funky Films, 462 F.3d at 1078 (finding no substantial similarity where one story "revolve[d] around the life of one character" and another story "explore[d] the intimate lives of each member of [a] family" and "developed separate plotlines around [them]").  Although Whitehead argues that Jade McKellan is the main character of Family Reunion, Compl. ¶¶ 4, 9(B); Opp'n at 2–4, it is not clear that the show favors any one member of the McKellan family.  See generally RJN Ex. 2.  Second, both works have several storylines that are absent in the other.  For example, No Fairy Tales does not mention of religion, Southern culture, traditional grandparents, or the trials and tribulations young children experience.  See generally RJN Ex. 1.  Family Reunion lacks sexual topics, college-related struggles, domestic violence,

26

and European adventure.  See generally RJN Ex. 2.  Third, to the extent that the characters in both works experience financial peril, they do so in different contexts—Jade Valentine is from "Chicago's worst ghetto neighborhood," RJN Ex. 1 at 50, while the McKellans merely adjust their finances to accommodate Moz's retirement.  See, e.g., RJN Ex. 2 at Part 2, Episode 9 (Cocoa avoids the salon to save money but accidentally shaves off an eyebrow).

Despite these high-level differences, both No Fairy Tales and Family Reunion feature storylines involving a teenage Black character named Jade who experiences criticism for her interest in a white boy.  See, e.g., RJN Ex. 1 at 65–67 (Jade Valentine fights with her mother over Tony); RJN Ex. 2 at Part 2 Episode 4 (Jade McKellan's father and grandmother fear the consequences of interracial dating in the South).  However, these similarities are both inconsequential and unprotectable.

No Fairy Tales introduces Jade Valentine's interracial relationship in its first chapter. RJN Ex. 1 at 1–8.  The novel then details the time she and her white boyfriend, Tony, spend getting to know each other (both in and out of school), with Jade Valentine eventually saying "I love you" for the first time.  See, e.g., id. at 14–21 (describing their first date), 58 ("Tony, I love you!).  During this time, Jade Valentine's mother and friends disapprove of their relationship, and she wonders if Tony is attracted only to her Blackness.  See, e.g., 65–67 (her mother insists that Tony is only interested in her Blackness), 69 ("My belief that Tony loved me evaporated as fast as it was set in stone"), 75–77 (a friend tells Jade Valentine to dump Tony).  While Jade Valentine is committed to the relationship, she and Tony soon break up for the first time.  Id. at 96–102.  After they rekindle their romance, the novel graphically describes their sexual experiences together. Id. at 151–59, 178–86.  Jade Valentine again experiences criticism for dating Tony but disregards her critics.  See, e.g., id. at 172–76 (after meeting Tony, Jade Valentine's father exclaims, "Get rid of him!"), 178–79 ("People disapprovingly shook their heads as we walked by draped in our love. . . . But fuck that. . . . I was invincible.").  However, the couple breaks up again after she goes to college.  Id. at 201–04.  She then has sex with

1    various men to try to forget about Tony.  Id. at 211–16.  Finally, the novel mentions Tony

2    several times even after he and Jade Valentine part ways, though he is no longer a

3    prominent character.  See id. at 209–61.

4         In Family Reunion, Jade McKellan's infatuation with her white chemistry lab

5    partner, Cody, spans only one twenty-eight-minute episode during the show's second

6    season.  See RJN Ex. 2 at Part 2, Episode 4.  The episode begins with Jade McKellan

7    introducing Cody to her parents (Moz and Cocoa) and grandmother (M'Dear) as they

8    prepare to study for class.  Id.  Cocoa is very supportive of Jade McKellan's crush, the pair

9    soon learn that Moz and M'Dear are concerned about Jade McKellan dating her white

10   classmate.  See, e.g., id. ("Now there are some folk in these parts who are not as open-

11   minded as they are on that West Coast.").  Jade becomes upset with Moz and M'Dear, id.

12   ("Wow, I knew you guys were old school, but I didn't realize you were racist."), but she

13   soon finds comfort in a friend who is excited about her interest in Cody.  Id.  Cody

14   eventually asks Jade McKellan to the school dance, but after seeing classmates disapprove,

15   she declines his offer.  Id.  Jade McKellan regrets her decision and tells Cody how she

16   feels, but he rejects her at the dance.  Id.  Cody makes no other appearances in Family

17   Reunion, and Jade McKellan soon moves on to other, exclusively non-white, teenage boys.

18   See, e.g., id. Part 2, Episodes 6–9 (two episodes after Jade McKellan's "crush" on Cody,

19   Jade McKellan enters a relationship with a non-white classmate).

20        These commonalities are insufficient to find substantial similarities in the works'

21   plots.  As other courts have determined, the basic premise of an interracial couple and its

22   associated tensions is too general a plot idea to be protectable.  See Griffin, 2018 WL

23   5117555, at *7–8 (holding that basic plot ideas involving "interracial couples and family

24   tensions" are not protectable); Nichols v. Universal Pictures Corp., 45 F.2d 119, 122 (2d

25   Cir. 1930) (holding that a work "based upon conflicts between [different racial groups],

26   into which the marriage of their children enters, is no more susceptible of copyright than

27   the outline of Romeo and Juliet.").  This storyline is commonplace across artistic media.

28   So, too, are commonplace plotlines revolving around teenage girls' controversial love

United States District Court
Northern District of California

1  interests.  Cf. Campbell, 718 F. Supp 2d at 1112 ("At a high level of generality, both works

2  are centered on the idea of a . . . young race-car driver . . . who learns life lessons from an

3  older mentor," but such generic stories are "basic plot idea[s] . . . not protected by

4  copyright law.") (citations omitted); Ricketts v. CBS Corps., 439 F. Supp. 3d 1199, 1212

5  (C.D. Cal. 2020) ("Both . . . [works] involve a talented African-American football player

6  from the 'hood' who eventually plays football for a school in a 'more privileged' area. . . .

7  However, 'a well-trodden rags to riches story arc . . . is not protectable.'"), reconsideration

8  denied, 19-CV-03895-DSF (MRWx), 2020 WK 3124218 (C.D. Cal. Mar. 19, 2020), aff'd

9  sub nom. Ricketts v. Berlanti Prods., 20-CV-55912, 2022 WL 1046252 (9th Cir. Apr. 7,

10 2022).

11          While Whitehead argues in her opposition brief that "[Jade McKellan's] fight[] with

12 her parents over having a romantic relationship with a teenage white boy is very similar to

13 . . . [Jade Valentine's] . . . romantic relationship with a white teenage boy," Opp'n at 7,

14 their stories are very different.  See RJN Ex. 1 at 1–186; RJN Ex. 2 at Part 2, Episode 4.

15 Unlike Jade Valentine and Tony, Jade McKellan and Cody never form a relationship; she

16 denies his offer to attend a dance with him, and he later rejects her attempt at

17 reconciliation.  See RJN Ex. 1 at 1–186; RJN Ex. 2 at Part 2, Episode 4.  Family Reunion

18 lacks any storylines about the couple's first dates, breakups, risqué activities, reunions, and

19 adult run-ins; Jade McKellan and Cody never reach these points.  See RJN Ex. 2 at Part 2,

20 Episode 4; see generally id.  And to the extent that each work features arguments about

21 pursuing interracial relationships, they are both different in kind and unprotectable scenes

22 that flow from this basic story arch.  See., e.g., RJN Ex. 1 at 65–67 (Jade Valentine's

23 mother believes Tony is taking advantage of "the power between [her] thighs."); RJN Ex.

24 2 at Part 2, Episode 4 (Moz and M'Dear worry about the prejudice Jade McKellan would

25 face); see also Benay, 607 F.3d at 625.  While everyone close to Jade Valentine

26 disapproves of her relationship with Tony, in Family Reunion, Jade McKellan's mother

27 and close friends encourage her interest in Cody.  See RJN Ex. 1 at 65–67, 75–77, 172–76;

28 RJN Ex. 2 at Part 2, Episode 4.  Any overlap between this plot point is also trivial—Jade

29

United States District Court
Northern District of California

Valentine's tumultuous relationship with Tony is the focus of most of <u>No Fairy Tales</u>, while Jade McKellan's innocent crush on Cody is limited to one episode in the series.  <u>See</u> RJN Ex. 1 at 1–186; RJN Ex. 2 at Part 2, Episode 4; <u>see also</u> <u>Carlini I</u>, 2021 WL 911684, at *11 (finding no substantial similarity where a 'minor subplot' was the only overlapping plot point in two works).

In sum, the Court concludes that the similarities between the plots of <u>No Fairy Tales</u> and <u>Family Reunion</u> are more superficial than substantial, where any similarity exists at all.  <u>See</u> <u>Carlini I</u>, 2021 WL 911684, at *11.  Although they share subplots involving interracial relationships, such general storylines are not protected, and any similarities they share flow naturally from this topic.  <u>See, e.g.</u>, <u>id.</u> at *10–12; <u>Benay</u>, 607 F.3d at 625.

Therefore, the works' plots are not substantially similar.

### ii.     Characters

In her Complaint, Whitehead alleges that the "main character" of Defendants' show is substantially similar to the main character in <u>No Fairy Tales</u> because they "cannot be separated" from each other.  <u>See</u> Compl. ¶¶ 4, 9(B).  The Complaint does not include allegations describing either the characters or indicating how they are similar.  <u>See</u> Compl.  Thus, the Court concludes that Whitehead insufficiently alleges that the characters are substantially similar.  <u>See</u> <u>Iqbal</u>, 556 U.S. at 678.

Turning to the contents of the works, Defendants argue that Whitehead cannot plausibly allege that the characters of <u>No Fairy Tales</u> and <u>Family Reunion</u> share any protectable similarities.  Mot. at 12. "Copyright protection is available only 'for characters that are especially distinctive.'"  <u>Blizzard Ent., Inc. v. Lilith Games (Shanghai) Co.</u>, 149 F. Supp. 3d 1167, 1173 (N.D. Cal. 2015) (citing <u>Rice v. Fox Broad. Co.</u>, 330 F.3d 1170, 1175 (9th Cir. 2003)).  Characters must be "sufficiently delineated and display consistent, widely identifiable traits" to receive copyright protection.  <u>DC Comics v. Towle</u>, 802 F.3d 1012, 1019 (9th Cir. 2015) (cleaned up).  Even where characters are protectable, courts require "a very high degree of similarity between the characters" to establish substantial similarity.  <u>Silas v. Home Box Off., Inc.</u>, 201 F. Supp. 3d 1158, 1177 (C.D. Cal. 2016),

aff'd, 713 F. App'x 626 (9th Cir. 2018).  Comparing her main character to the likes of

Hans Solo,[14] Whitehead argues in her opposition brief that No Fairy Tales' Jade Valentine

is protectable, and that Jade Valentine and Jade McKellan are substantially similar because

they share "the same mannerisms, style, issues, life lessons, and even physical

appearance."  See Opp'n at 2.

      The Court now describes Jade Valentine and Jade McKellan in detail.[15]

      For most of Whitehead's novel, Jade Valentine is a mature-but-lovestruck

seventeen-year-old high school senior living with her single mother and younger siblings

in the West Side of Chicago.  RJN Ex. 1 at 3–5, 7, 50–51, 59-60, 81; id. at 1–186.  She is

Black, light-skinned, curvy, poor, spunky, and promiscuous.  See id. at 3–4, 7, 50–51, 81,

151.  Whitehead portrays Jade Valentine as a confident but crass teenager who goes after

what she wants.  See, e.g., id. at 100–01 (describing herself as "amazing" but recognizing

that breaking up with Tony would "hurt[] too fucking much.").  Although she prioritizes

her relationship Tony, she also plays the violin and enjoys singing.  See, e.g., id. at 112

(declaring herself "Jade, the Singing Violinist!").  The novel also shows Jade Valentine

growing up, heading to college, experiencing violent and highly sexualized relationships,

and becoming a renowned adult violin player in Europe.  Id. at 187–261.

      Conversely, in Family Reunion, Jade McKellan is always around fifteen-years-old

and living with her successful, married parents, three younger siblings, and grandparents.

See generally RJN Ex. 2.  Jade McKellan is Black, light-skinned, curvy, eager to grow up,

and sometimes boy crazy.  See, e.g., id. at Part 2, Episodes 6–8 (sneaking out to meet a

boy her parents disapprove of); Part 4, Episode 3 (traveling to imaginary "Grown City.").

As mentioned above, she develops a crush on a white classmate in the show's second

season, but it fizzles within the scope of a single episode.  Id. at Part 2, Episode 4.  Finally,

---

[14]  Hans Solo is a prominent character in the Star Wars franchise.  See "Star Wars Databank,"
https://www.starwars.com/databank/han-solo.

[15]  The Court focuses on Jade Valentine and Jade McKellan because No Fairy Tales does not have
characters akin to the seven other members of the McKellan family, and because the opposition
brief made clear Whitehead's focus is on the Jade McKellan character.  See Opp'n at 3, 7; Reply
at 2.

Jade McKellan is also a talented singer who enjoys fashion.  See, e.g., id. at Part 2, Episode 6 (auditioning for the "G Club"), Part 3, Episode 6 (becoming a stylist and giving friends and family makeovers).

The Court concludes that there is not a high degree of similarity between No Fairy Tales' Jade Valentine and Family Reunion's Jade McKellan. See Silas, 201 F. Supp. 3d at 1177.  First, the characteristics they share are unprotectable because they are not distinctive.  See Towle, 802 F.3d at 1019.  Although both characters are teenagers named "Jade," courts have held that ages and names are not protectable, especially "where . . . the names are generic."  See Marcus v. ABC Signature Studios, Inc., 279 F. Supp. 3d 1056, 1069 (C.D. Cal. 2017) ("The fact that the families in both works have the last name Johnson and both have son characters who are 'juniors' is of no consequence"). Whitehead does not argue that the name "Jade" is unique, see Opp' n, but Defendants claim that it "is among the 100 most popular girls' names."  Mot. at 2.  Additionally, while both characters are curvy, light-skinned Black women who may share some values and mannerisms that stem from Black culture, these elements are not protectable because they naturally flow from works that prominently feature and celebrate Black characters.  See Benay, 607 F.3d at 625; Ricketts, 439 F. Supp. 3d at 1215–17.  Moreover, the characters' singing talents, basic personality traits, and interests in boys are unprotectable because these are "stock" qualities of modern teenage characters.  See Marcus, 279 F. Supp. 3d at 1069 ("Other than being typical teenage girls, the two characters are quite different . . . merely describ[ing] the majority of today's teenagers" is not protectable); Benay, 607 F.3d at 625.

Second, Jade Valentine and Jade McKellan are substantially different in several ways.  See Griffin, 2018 WL 5117555, at *8.  To start, Jade Valentine experiences serious poverty, see, e.g., RJN Ex. 1 at 83–92 (she struggles to pay for college applications), but Jade McKellan lives a comfortable life, notwithstanding her family's financial worries after Moz retires from professional football.  See, e.g., RJN Ex. 2 at Part 4, Episode 3 (Jade McKellan hopes to get expensive shoes for Christmas).  Moreover, Jade Valentine is a

talented violinist, but there is no indication that Jade McKellan can play any musical instrument.  See RJN Ex. 1 at 50–52; RJN Ex. 2.  Whitehead also portrays Jade Valentine as crass and promiscuous, both in her frequent use of swear words and her sexual exploits with Tony and other men.  See, e.g., RJN Ex. 1 at 150–58 (describing Jade Valentine and Tony's first sexual encounter), 211–15 (Jade Valentine begins using men as a distraction).  On the other hand, Jade McKellan never utters a bad word and does not engage in sexual activity.  See generally RJN Ex. 2.  And although Whitehead claims that the characters share the same "style," Mot. at 2, No Fairy Tales does not describe Jade Valentine's fashion choices in any detail.  See generally RJN Ex. 1.  Jade McKellan has a close relationship with a large and supportive family including her parents, younger siblings, and grandparents.  See generally RJN Ex. 2.  Conversely, Jade Valentine lives only with her single mother and unnamed younger siblings, has an absent father, and does not mention her grandparents.  See RJN Ex. 1 at 59–61, 172.  Finally, Jade McKellan never ages beyond fifteen in Family Reunion, so it is impossible to relate her character to Jade Valentine's adulthood tales.  See generally RJN Exs. 1–2.

Accordingly, the Court concludes that Whitehead cannot plausibly allege that the characters of No Fairy Tales and Family Reunion are substantially similar because there is not a high degree of similarity between them.  See Silas, 201 F. Supp. 3d at 1177.  As Defendants note, any similarities that the characters share are merely unprotectable "stock similarities" that many works involving teenage girls may share.  Mot. at 12; see also Marcus, 279 F. Supp. 3d at 1069 (holding that "merely describ[ing] the majority of today's teenagers" is not protectable).

### iii.    Dialogue

In her Complaint, Whitehead also alleges that No Fairy Tales and Family Reunion share substantial similarities in their dialogue, but again, she fails to provide any facts about the dialogue she references.  Compl. ¶ 4; see id.  Thus, Whitehead insufficiently alleges that the works are substantially similar in this regard.  See Iqbal, 556 U.S. at 678.

Defendants argue that any dialogue the works share cannot support a copyright

claim. Mot. at 13. The Ninth Circuit requires an "extended similarity of dialogue . . . to support a claim of substantial similarity based on this issue." DuMond, 2021 WL 4772986, at *16 (quoting Olson v. Nat'l Broad. Co., Inc., 855 F.2d 1446, 1450 (9th Cir. 1988)). "Ordinary words and phrases are not entitled to copyright protection, nor are 'phrases or expressions conveying an idea typically expressed in a limited number of stereotyped fashions.'" Bernal v. Paradigm Talent & Literary Agency, 788 F. Supp. 2d 1043, 1071 (C.D. Cal. 2010) (quoting Narell v. Freeman, 872 F.2d 907, 911–12 (9th Cir. 1989)). Whitehead does not address the works' dialogues in her opposition. See Opp'n.

After reviewing No Fairy Tales and Family Reunion, the Court found only one instance in which their dialogue overlaps. Both works use phrases like "chocolate-vanilla swirl" to refer to interracial relationships. In No Fairy Tales, Jade Valentine uses the expression while reminiscing about her white ex-boyfriend's interest. RJN Ex. 1 at 4 ("Maybe [Tony] wanted some chocolate-vanilla swirl."). Likewise, the Family Reunion episode in which Jade McKellan has a crush on a white classmate is titled "Remember When Jade was Down with the Swirl?", and several characters use the word "swirl" to refer to interracial couples. RJN Ex. 2 at Part 2, Episode 4 (while offering Jade frozen yogurt, a classmate and her mother separately suggest "the swirl" flavor).

The Court concludes that the works' shared reference to chocolate-vanilla swirls does not constitute an "extended similarity" in dialogue because their context, wording, and presentation are different. See Olson, 855 F.2d at 1450. Whitehead uses the phrase "chocolate-vanilla swirl" only once in her 264-page novel. RJN Ex. 1 at 4; see generally id. The words "the swirl" appear at least three times in Family Reunion, but their occurrence is limited to one episode in a thirty-four-episode series. See RJN Ex. 2 at Part 2, Episode 4; see generally id. Additionally, no character in Family Reunion uses the exact phrase, "chocolate-vanilla swirl." Id. at Part 2, Episode 4. This overlap in dialogue is therefore "isolated and involves common words or phrases," which does not itself demonstrate "extended similarity." Shame on You Prods., Inc. v. Elizabeth Banks, ("Shame on You I") 120 F. Supp. 3d 1123, 1156 (C.D. Cal. 2015), aff'd sub nom. Shame

United States District Court
Northern District of California

on You Prods., Inc. v. Banks, 690 F. App'x 519 (9th Cir. 2017); see Gallagher, 2015 WL 12481504, at *10 ("[T]hree sentences taken from a 302-page book compared to three sentences from a 90-minute motion picture falls short of the 'extended similarity' required for . . .  substantial similarity").

Moreover, the works' use of chocolate-vanilla "swirls" to describe interracial relationships is not protectable because it is a short, "stock phrase" often used to "convey[] an idea typically expressed in a limited number of stereotyped fashions." Bernal, 788 F. Supp. 2d at 1071 (cleaned up); see Marcus, 249 F. Supp. 3d at 1070 (holding that even if identical dialogue refers to "being [B]lack," it is not likely to support a finding of substantial similarity).

Defendants additionally argue that any shared dialogue "pertain[ing] to general references associated with Black culture in the works" cannot support a finding of substantial similarity. Mot. at 13.  The Court agrees.  While the Court could not identify any explicit similarities in this regard (aside from the works' use of the word "swirl"), common linguistical references to Black culture are not protectable without additional extended similarity in dialogue. See Marcus, 249 F. Supp. 3d at 1070.

Accordingly, the Court finds that the works do not contain "extended similarities" in dialogue because they each share only one short, unprotectable phrase commonly used to describe an idea. See Silas, 201 F Supp 3d at 1181 (finding that one instance of similar dialogue did not establish substantial similarity); Marcus, 249 F. Supp. 3d at 1070 (same). Thus, the works' dialogues are not substantially similar.

### iv.    Theme

Whitehead does not allege that the works' themes are substantially similar in her Complaint.  See Compl.  Defendants, however, argue that the themes of No Fairy Tales and Family Reunion are "entirely dissimilar."  Mot. at 13.  "A work's theme is its overarching message."  Silas, 201 F. Supp. 3d at 1180.  Stock themes, or themes that flow from a basic premise, are not protected by copyright law.  Id.; Cavalier, 297 F.3d at 823. Defendants contend that the overarching themes of No Fairy Tales include lessons about

"how crazy a woman can get when she really loves a man" and giving up on love after losing one's true love.  Mot. at 13–14 (quoting RJN Ex. 1 at 262).  The Court agrees.  No Fairy Tales also features several sub-themes throughout the novel, including sexual violence and empowerment, overcoming racism, and "rags to riches" success.  See RJN Ex. 1. at 178–79, 230–37, 249–54.

On the other hand, Defendants argue that the theme of Family Reunion is a family-friendly message about "mov[ing] from Seattle to small-town Georgia, where life down South and traditional grandparents challenge their big city ways."  Mot. at 4.  The Court agrees that the overarching themes of the series revolve around family—whether learning to adapt to Southern culture, the importance of connecting with one's roots, or approaching life's obstacles with those you love.  See generally RJN Ex 2.  Like No Fairy Tales, Family Reunion has its share of sub-themes, including recognizing Black history, confronting racism, and learning from various types of relationships.  See, e.g., id. at Part 1, Episode 10 (a racist police officer stops and handcuffs Shaka and Mazzi on their lawn); Part 2, Episode 4 (Jade McKellan learns to follow her heart instead of fearing prejudice); Part 3, Episode 4 (M'Dear retells her history to save a historical landmark).

Although Defendants correctly point out that the works have very different overarching themes, they share at least two sub-themes: overcoming or addressing racism and lessons about romantic relationships.  See Mot. at 13–14; RJN Exs. 1–2.  However, these themes are too generic to be protectable because they naturally flow from stories featuring Black characters and young adults.  See Esplanade Prods., Inc. v. Walt Disney Co., 17-CV-02185-MWF (JCx), 2017 WL 5635027, at *11 (C.D. Cal. Nov. 8, 2017), aff'd, 768 F. App'x 732 (9th Cir. 2019) ("[W]hether one can become anything he or she wants to be, whether one can overcome . . . the prejudices inherent in a diverse society . . . [and] within oneself, or whether characters can achieve success while upholding moral and ethical behavior are too generic to be protectable." (cleaned up)).  And as explained above, both works develop these similar themes in different ways.  See, e.g., Funky Films, 462 F.3d at 1079 ("Although both works explore themes of death, relationships, and sex, they

do so in very different ways."); Griffin, 2018 WL 5117555, at *8 (finding no substantial similarity where "[b]oth works explore themes of relationships and race[] but do so in distinct ways."). As a result, any similarities in theme between No Fairy Tales and Family Reunion are irrelevant because they do not share protectable thematic elements. See DuMond, 2021 WL 4772986, at *16.

The Court therefore concludes that the works do not have substantially similar themes.

### v.   Setting

Whitehead also does not allege that the works' settings are substantially similar in her Complaint. See Compl. For their part, Defendants argue that even a cursory review of the works show that their settings are not substantially similar. Mot. at 14. "'[C]ommonplace settings such as houses, front yards, offices, restaurants, interiors of cars, and so on,' without more, cannot show substantial similarity." Carlini I, 2021 WL 911684, at *13 (quoting Bernal, 788 F. Supp. 2d at 1071).

The Defendants are correct. As they explain, No Fairy Tales begins in the West Side of Chicago, one of the city's poorest neighborhoods. Mot. at 14; see RJN Ex. 1 at 50. Most of young Jade Valentine's story takes place at her home, her high school (in hallways and classrooms), and various locations in Chicago. See, e.g., RJN Ex 1 at 5–7 (Jade Valentine learns that Tony visited her home), 8–10 (Jade Valentine and Tony reconnect at school), 159 ("[A]ll of Chicago was our bedroom"). After Jade Valentine graduates, her story is set in a predominantly white college town in Central Illinois and, eventually, several European countries. RJN Ex. 1 at 189–261.

Family Reunion largely takes place in Columbus, Georgia, with a few "flashback" scenes detailing the family's journey from Seattle, Washington. Mot. at 14; see generally RJN Ex. 2. Most scenes occur at the McKellan family home or at the children's school (in hallways and classrooms). See generally RJN Ex. 2.

Clearly, the works are set in very different places. Even though No Fairy Tales and Family Reunion feature scenes in school hallways and classroom, these settings are

37

1    unprotectable <u>scenes a faire</u> that flow from stories set in schools.  <u>See, e.g.</u>, <u>Ricketts</u>, 439

2    F. Supp. 3d at 1217 ("[S]cenes taking place at school and on the football filed naturally

3    flow from the basic plot points."); <u>Shame on You I</u>, 120 F. Supp. 3d at 1159 ("The use of a

4    gentleman's bedroom is a [<u>scene a faire</u>], since going home with someone met at a bar,

5    party, or club is an essential element of a walk of shame.").

6            Accordingly, the works' settings are not substantially similar.

7                              **vi.    Mood**

8            Once again, Whitehead's Complaint does not contain any allegations regarding the

9    works' similarities in mood.  <u>See</u> Compl.  Defendants point this out in their motion and

10   argue that the moods of <u>No Fairy Tales</u> and <u>Family Reunion</u> "are not remotely similar."

11   Mot. at 14.  The Court agrees.

12           <u>No Fairy Tales</u> consistently carries dramatic, romantic, vulgar, and often dark

13   moods as Jade Valentine copes with losing her true love, struggling to afford college, and

14   escaping from troubled situations.  <u>See, e.g.</u>, RJN Ex. 1 at 118–19 (describing herself as

15   "mad at life"), 187 ("I had no opportunity to get scholarships whatsoever.  Four years of

16   Ms. Vega's 'Excellence!' went down a fucking drain."), 230–38 (detailing Jade Valentine

17   possibly killing Raj in self-defense).  However, <u>Family Reunion</u> is an upbeat, heartfelt, and

18   family-oriented comedy. Mot. at 15; <u>see generally</u> RJN Ex. 2.

19           Because of this stark contrast in moods, the two works are not substantially similar

20   in this regard.  <u>See, e.g.</u>, <u>Thomas v. Walt Disney Co.</u>, 07-CV-04392-CW, 2008 WL

21   425647, at *5 (N.D. Cal. Feb. 14, 2008) (declining to find substantial similarity where one

22   work had a "suspenseful and potentially scary mood" and the other was a "happy, light

23   children's tale" (cleaned up)), <u>aff'd</u>, 337 F. App'x 694 (9th Cir. 2009).  Moreover, even

24   where <u>No Fairy Tales</u> has comical moments (and <u>Family Reunion</u> addresses serious

25   topics), these mood changes are brief, and the works soon return to their consistently dark-

26   or light-hearted moods as before.  <u>See</u> <u>Bernal</u>, 788 F. Supp. 2d at 1070 (finding no

27   substantial similarity in mood where one work had "few humorous elements" but the other

28   work was "consistently funny throughout the entire show."); <u>see generally</u> RJN Exs. 1–2.

United States District Court
Northern District of California

1   Thus, the Court concludes that <u>No Fairy Tales</u> and <u>Family Reunion</u> do not share

2   substantial similarities in their moods.

3   ### vii.   Pace and Sequence of Events

4   Whitehead does not allege that the works have substantially similar paces or

5   sequences of events.  <u>See</u> Compl.   Defendants argue that the works' paces and sequences

6   are entirely dissimilar because <u>No Fairy Tales</u> takes place over at least a decade, whereas

7   <u>Family Reunion</u> spans only three to four years.  Mot. at 15.  Courts review the timeline of

8   the works to determine whether their pace is substantially similar.  <u>See, e.g.</u>, <u>Kouf v. Walt</u>

9   <u>Disney Pictures & Television</u>, 16 F.3d 1042, 1046 (9th Cir. 1994) (finding dissimilar paces

10  where one story was told in 24 hours and the other was told over multiple days).  A pace

11  that "flow[s] necessarily or from a basic plot premise, cannot sustain a finding of

12  infringement."  <u>Silas</u>, 201 F. Supp. 3d at 1081–82 (quoting <u>Cavalier</u>, 297 F.3d at 823).

13  Relatedly, courts look to the order in which plot points occur to assess the similarity of

14  works' sequence of events.  <u>See, e.g.</u>, <u>Ricketts</u>, 439 F. Supp at 1219–20 (reviewing the

15  order in which plot points occur in two works at the scene level).

16  The Court first concludes that <u>No Fairy Tales</u> and <u>Family Reunion</u> do not have

17  substantially similar paces.  Defendants are correct—Jade Valentine's story in <u>No Fairy</u>

18  <u>Tales</u> unfolds over fifteen years as she transitions from high school, to college, to being a

19  professional violinist.  <u>See</u> Mot. at 15; <u>see also</u> RJN Ex. 1; <u>id.</u> at 2 (the novel begins with a

20  retrospective in which Jade Valentine says, "Yet, I still can't believe fifteen years has

21  already passed.").  While the beginning of the novel slowly follows Jade Valentine's new

22  relationship with Tony, <u>see, e.g.</u>, RJN Ex. 1 at 11–22 (chapters three and four detail the

23  hours of their first date), it is not uncommon for entire months, or even years, to pass

24  between chapters.  <u>See, e.g.</u>, <u>id.</u> at 94–96 (the novel moves from March to April between

25  chapters twenty and twenty-one), 252–55 (chapter fifty spans more than two years).

26  Contrarily, the entire <u>Family Reunion</u> series takes place over three to four years; the

27  children never age out of school or enter adulthood.  <u>See generally</u> RJN Ex. 2.  Each

28  episode typically spans a few days, including the episode when Jade McKellan has a crush

39

on a white classmate.  See id.; id. at Part 2, Episode 4.  The works do not have similarities in pace because No Fairy Tales moves much more quickly.  See Kouf, 16 F.3d at 1046.  And to the extent that the works each take time to explore their characters' relationships in greater detail, such slower paces naturally flow from the depiction of romance.  See RJN Ex. 1 at 1–186; RJN Ex. 2 at Part 2, Episode 4; see also Silas, 201 F. Supp. 3d at 1081–82.

Next, the Court concludes that the works do not share substantially similar sequences of events.  First, they begin differently.  No Fairy Tales initially introduces readers to Jade Valentine as her relationship with Tony is set to begin.  See RJN Ex. 1 at 1–7.  Family Reunion begins with a family visit to Columbus, Georgia, and the series' first season focuses on the ramifications of their decision to stay.  See RJN Ex. 2 at Part 1, Episodes 1–10.  Second, both works contain events and plotlines that are completely absent from the other.  See, e.g., RJN Ex. 1 at 83–94 (Jade nearly forgets to apply to college); RJN Ex. 2 at Part 2, Episode 5 (Jade McKellan's younger siblings experience bullying).  Third, while more than the first half of No Fairy Tales focuses on Jade Valentine's interracial relationship, see RJN Ex. 1 at 1–186, Family Reunion does not address Jade McKellan's interest in a white classmate until well into the show's second season (approximately midway through the series as of the time of Whitehead's Complaint).  See RJN Ex. 2 at Part 2, Episode 4.

Though the works share one event—an interracial relationship—this is inconsequential because they develop this plotline so differently.  See Ricketts, 439 F. Supp 3d at 1220 (finding no substantial similarity in sequence of events even where both works share facially similar plot points because they are portrayed differently).  As discussed above, Jade Valentine's relationship progresses in the following order: Tony appears at her home; the couple dates; she professes her love for Tony and fights with her mother; the couple breaks up for the first time, the couple reconciles; the couple becomes sexually active, she fights with her father and experiences prejudice, the couple breaks up for a second time, the lose touch, and she confronts Tony in Europe years later.  RJN Ex. 1 at 1–186, 203–06, 207–38, 255–61.  The sequence of Jade McKellan's relationship is

40

distinct: she introduces Cody to her family; she and her mother disagree with Moz and M'Dear about interracial dating; Cody asks her to the dance, but she declines after seeing her classmates disapprove; she regrets her decision and tells Cody how she feels at the dance; Cody rejects her.  RJN Ex. 2 at Part 2, Episode 4.  Any slight similarities flow naturally from their plots.  See Ricketts, 439 F. Supp. 3d at 1220–21.

Therefore, the Court determines that No Fairy Tales and Family Reunion do not share substantially similar paces or sequences of events.

### viii.    The Combination of Unprotected Elements

Although neither Whitehead nor Defendants address whether No Fairy Tales and Family Reunion share substantial amounts of "the same[] combination of unprotectable elements," the Court address this possibility out of an abundance of caution.  Hathaway, 2021 WL 1862248, at *6 (quoting Skidmore, 952 F.3d at 1075); see also Compl.; Mot.; Opp'n; Reply.

Even if two works share only unprotectable component parts, "the particular sequence in which an author strings a significant number of unprotectable elements can itself" support a claim of copyright infringement.  Metcalf v. Bochco, 294 F.3d 1069, 1074 (9th Cir. 2002) (emphasis added), overruled on other grounds by Skidmore, 952 F.3d at 1064.  "Many courts have been reluctant to expand this concept" beyond clear-cut cases that share "striking similarities."  Zella v. E.W. Scripps Co., 529 F. Supp. 2d 1124, 1138 (C.D. Cal. 2007).  "[A] combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their combination constitutes an original work of authorship."  Satava v. Lowry, 323 F.3d 805, 811 (9th Cir 2003).  A list of shared unprotectable "random similarities scattered throughout the works" is "inherently subjective and unreliable," and, thus, insufficient to establish substantial similarity.  Gallagher, 2015 WL 12481504, at *14 (quoting Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1984)) (cleaned up).

Whitehead cannot establish that No Fairy Tales and Family Reunion share strikingly similar sequences of "significant . . .  protectable elements."  See Metcalf, 294

United States District Court
Northern District of California

F.3d at 1074; Zella, 529 F. Supp 2d at 1138.  As explained above, most of the

unprotectable similarities the works share—a Black character named "Jade," a teenage

interracial relationship, and racial tensions surrounding the relationship—are distinctive

when viewed in context.  See RJN Ex. 1; Ex. 2 at Part 2, Episode 4; see also, e.g., Bernal,

788 F. Supp. 2d at 1067 ("The elements that [the plaintiff] contends are similar are . . .

markedly different when viewed in context.  Further, [the plaintiff] has not pointed to any

common pattern of unprotected elements that occur in the same sequence in both works.").

They also do not occur in the same sequence.  See RJN Ex. 1; Ex. 2 at Part 2, Episode 4.

Moreover, the works' similarities concerning their characters' interracial relationships are

de minimis because this plotline only occurs in one twenty-eight-minute episode of Family

Reunion, but it is the focus of a large portion of No Fairy Tales.  See RJN Ex. 1 at 1–186,

203–06, 255–61; RJN Ex. 2 at Part 2, Episode 4; see also Gallagher, 2015 WL 12481504,

at *14 (declining to find a protectable arrangement of unprotectable elements where "the

similarities [were] drawn from a 302-page book and a 90-minute film, rather than 280

combined pages between the two").

Consequently, the works' shared unprotectable elements do not establish substantial

similarity under Metcalf because they are not significant in number, unique to basic plot

premises, or arranged in strikingly similar ways.  See Metcalf, 294 F.3d at 1074;

Gallagher, 2015 WL 12481504, at *14; Esplanade Prods., 2017 WL 5635027, at *15–16.

### ix.     Summary

Reviewing the allegations in Whitehead's Complaint and the works at issue in their

entirety has revealed two things: (1) Whitehead fails to factually allege substantial

similarity and (2) No Fairy Tales and Family Reunion are not substantially similar.  The

works' plots, characters, dialogue, theme, setting, mood, pace, and sequence of events do

not share protectable similarities as required by the extrinsic test.  See Funky Films, 462

F.3d at 1077.  In fact, most of No Fairy Tales and Family Reunion are quite different.  See

generally RJN Exs. 1–2.  While No Fairy Tales and Family Reunion share some

unprotected elements, including Black teenage characters named "Jade," subplots about

United States District Court
Northern District of California

1
2
3
4
5
6

interracial relationships, and lessons about racism, these generic similarities are not arranged in strikingly similar fashion.  See id.; see also Metcalf, 294 F.3d at 1074.  Rather, a closer look at the works shows that they develop the shared elements dissimilarly.  See, e.g., RJN Ex. 1 at 1–186 (Jade Valentine's relationship with her white boyfriend is passionate, tumultuous, and sexual); RJN Ex. 2 at Part 2, Episode 4 (Jade McKellan and her white classmate never begin a romantic relationship).

7
8
9
10
11
12
13
14
15

Therefore, the Court holds that No Fairy Tales and Family Reunion are not substantially similar as a matter of law.  See Christianson, 149 F.2d at 203.  This is not a case in which there are exceedingly close issues of fact because the works are fundamentally different.  See Zindel, 815 F. App'x at 159.  Because the works are not substantially similar, Whitehead cannot reasonably allege that Defendants unlawfully appropriated her copyrighted novel.  See Skidmore, 952 F.3d at 1064; see also Kouf, 16 F.3d at 1045 ("[A] plaintiff who cannot satisfy the extrinsic test necessarily loses . . . because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests.").

16

## IV.    CONCLUSION

17
18
19
20
21

For the foregoing reasons, the Court GRANTS Defendant's Request for Judicial Notice and Incorporation by Reference, and Defendants' Motion to Dismiss without leave to amend.  Amendment is futile because it is exceptionally clear that Whitehead cannot state a claim for copyright infringement.  Whitehead has not, and cannot, plausibly allege either the "copying" or "unlawful appropriation" of No Fairy Tales by Defendants.

22

**IT IS SO ORDERED.**

23

Dated: November 30, 2022

24
25
26
27
28

CHARLES R. BREYER
United States District Judge